IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

MALCOLM STATHAM,                    )
                                    )
            Plaintiff,              )
                                    )
      v.                            )  Case No.
                                    )  09-0259-CV-W-REL-SSA
MICHAEL J. ASTRUE, Commissioner     )
of Social Security,                 )
                                    )
            Defendant.              )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Malcolm Statham seeks review of the final decision
of the Commissioner of Social Security denying plaintiff's
application for disability benefits under Titles II and XVI of
the Social Security Act ("the Act").  Plaintiff argues that the
ALJ erred in (1) finding plaintiff not credible, (2) failing to
give controlling weight to Dr. Dembinski's full opinion on
plaintiff's restrictions, (3) failing to consider plaintiff's
osteoarthritis in his left hand, and (4) relying on a
hypothetical which did not accurately detail all of plaintiff's
impairments.  I find that the substantial evidence in the record
as a whole supports the ALJ's finding that plaintiff is not
disabled.  Therefore, plaintiff's motion for summary judgment
will be denied and the decision of the Commissioner will be
affirmed.

## I.    BACKGROUND

On February 15, 2006, plaintiff applied for disability benefits alleging that he had been disabled since May 1, 2004. Plaintiff's disability stems from seizures and asthma. Plaintiff's application was denied on March 16, 2006.  On August 18, 2008, a hearing was held before an Administrative Law Judge. On September 24, 2008, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On February 4, 2009, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.   STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in

opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the

plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.   Does the impairment prevent the claimant from doing past relevant work?

          No = not disabled.
          Yes =  go to next step where burden shifts to Commissioner.

5.   Does the impairment prevent the claimant from doing any other work?

          Yes = disabled.
          No = not disabled.

## IV.  *THE RECORD*

The record consists of the testimony of plaintiff and vocational expert Barbara Myers, in addition to documentary evidence admitted at the hearing.

## A.   *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

## Earnings Record

The record establishes that plaintiff earned the following income from 1973 through 2004:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1973 | $      30.48 | 1989 | $ 1,701.78 |
| 1974 | 33.60 | 1990 | 2,793.81 |
| 1975 | 0.00 | 1991 | 12,379.00 |
| 1976 | 0.00 | 1992 | 15,719.88 |
| 1977 | 0.00 | 1993 | 3,343.06 |
| 1978 | 0.00 | 1994 | 8,613.63 |
| 1979 | 4,204.20 | 1995 | 4,286.04 |
| 1980 | 3,223.81 | 1996 | 56.84 |

| 1981 | 0.00 | 1997 | 5,682.80 |
|------|------|------|----------|
| 1982 | 0.00 | 1998 | 14,225.18 |
| 1983 | 0.00 | 1999 | 14,898.85 |
| 1984 | 0.00 | 2000 | 8,801.83 |
| 1985 | 0.00 | 2001 | 19,323.32 |
| 1986 | 0.00 | 2002 | 1,250.77 |
| 1987 | 0.00 | 2003 | 0.00 |
| 1988 | 2,825.26 | 2004 | 235.00 |

(Tr. at 74-85).

Plaintiff had no earnings after 2004 (Tr. at 87).

**Function Report**

In a Function Report dated March 7, 2006, plaintiff described his daily activities as fixing something to eat, doing dishes, watching television, doing inside chores, eating lunch, visiting friends or going to the library, having dinner, watching television, and going to bed (Tr. at 99-106). He reported that he cooks meals every day for "however long it takes to cook" them. He was able to clean and do laundry for one to two hours each, "as needed." He was able to go out every day, walking, riding in a car, or using public transportation. He shopped two to three times a week for "as long as needed."

The form asked plaintiff to circle the abilities affected by his impairment. He circled only "walking." Plaintiff did not circle lifting, squatting, bending, standing, reaching, sitting,

kneeling, talking, hearing, stair climbing, seeing, memory,
completing tasks, concentration, understanding, following
instructions, using his hands, or getting along with others.  He
reported that he finishes what he starts, he is able to follow
written instructions reasonably well, and he is able to follow
spoken instructions "fair."  He handles stress and changed in
routine "fairly well."

**B.    *SUMMARY OF MEDICAL RECORDS***

On July 6, 2004, plaintiff was seen at Swope Health
complaining of right ear pain (Tr. at 188-189).  He reported that
he was smoking 1/2 pack of cigarettes per day and was using
marijuana.  He was assessed with an ear infection.

On July 13, 2004, plaintiff was seen at Swope Health
complaining of right ear pain for the past two weeks (Tr. at 186-
187).  His general exam was normal.  He continued to smoke
cigarettes and marijuana.  He was assessed with tinnitus (ringing
in the ears).

On August 22, 2004, plaintiff was seen at Swope Health
complaining of a cough (Tr. at 190-191).  Otherwise he was "doing
fine."  His general exam was normal.  He continued to smoke
cigarettes and marijuana.  He was assessed with chronic
obstructive pulmonary disease and was prescribed Albuterol.

On August 24, 2004, plaintiff was seen in the emergency room due to mental status changes (Tr. at 142-143).

> HISTORY OF PRESENT ILLNESS:  The patient is a 40-year-old male who was reported to have taken a sandwich out of a vending machine at a gas station, went out in the rain and just wrung it out like a wash rag, then he was reported to sit on the ground.  He was never reported to have completely lost consciousness.  The patient, himself, revealed that he cannot remember that particular episode. He states he has a history of drug use in the past and is intermittently homeless. He denies that he is having severe headache or that he was traumatized recently.  He denies nausea, vomiting, fever or chills.

> CURRENT MEDICATIONS:  Albuterol inhaler.

> * * * * *

> REVIEW OF SYSTEMS:  As per history of present illness. All other systems are reviewed and are negative.

> * * * * *

> EMERGENCY ROOM COURSE AND TREATMENT:  . . .  The etiology of the reported mental status change is not distinctly apparent, but he does not appear to have any evidence of ongoing neurological residual and felt to be stable for discharge.

> CLINICAL IMPRESSION:  Mental status change - resolved.

On September 3, 2004, plaintiff was seen at Swope Health for a refill on his asthma medication (Tr. at 184-185).  He continued to smoke cigarettes and use marijuana.  He reported no pain.  His general exam was normal.  He was assessed with asthma and his medications were refilled.

On September 15, 2004, plaintiff went to the emergency room due to bilateral hip pain (Tr. at 133, 137-140).  "The patient

said he had some relief after urination.  He was drinking lots of fluids last week.  He feels like somebody took a 2 by 4 to his buttocks suddenly.  The pain is 10 out of 10 in intensity."

Plaintiff was listed as a smoker.  An exam was performed: "Temperature 97.0, pule 93, respirations 18, blood pressure 1219/84.  Pulse oximetry 98%.  The patient is alert, oriented, verbal, appropriate, warm, dry, cooperative.  Cranial nerves intact. Speech normal.  Head, ears, eyes, nose, and throat normal.  Neck has no adenopathy [large or swollen lymph nodes]. Lungs were clear to auscultation bilaterally.  Heart rate and rhythm regular.  Abdomen is soft and nontender to palpation. Long bones were intact.  The sensation in the lower extremities is normal.  Reflexes in the lower extremities were normal. Babinski's were negative.  Straight leg raising is negative. Tenderness is difficult to reproduce on palpation in the lower back area over the sacrum where the patient said he was hurting."

X-rays of the pelvis and lumbosacral spine were negative. Plaintiff was given Toradol (non-steroidal anti-inflammatory) intramuscularly and later was napping in the emergency room.  "Of interest was the severity of the pain prior to the shot.  Prior to the injection, the patient was banging his head against the wall with pain."  He was diagnosed with acute low back strain and

was given Flexeril (muscle relaxer) and Naprosyn (non-steroidal anti-inflammatory).

On October 6, 2004, plaintiff went to the emergency room with lacerations and abrasions on his face (Tr. at 134-136). "Patient was apparently inebriated last evening, on a drinking binge with a friend. He tripped and fell with resultant lacerations of his face and abrasions and contusions. Patient was not dazed or knocked unconscious. Did not seek medical attention last evening. He presents approximately 10 hours after the injury. Patient notes no neurological impairment. . . . He denies a history of delirium tremens or seizures. . . . He is homeless. He has no neck pain, no other somatic complaints. No chest pain, no shortness of breath. . . . The patient has no means for medications. . . . Does smoke." Plaintiff was given thiamine (a vitamin) and Ancef (antibiotic), and his laceration was stitched. "Attempt will be made to provide a shelter. The patient is to have followup wound check in two days, stitches out in 5-7 days."

Two days later, plaintiff returned to independence Regional Health Center emergency room for a wound check (Tr. at 130-131). "The patient was seen here two nights ago with suturing of his facial area after he was injured. He state[s] that he did not want to walk to the Swope Parkway Care Center to be re-examined

today, so he is here today." Plaintiff was told to go to Swope Parkway for suture removal as planned.

On October 28, 2004, plaintiff was seen at Swope Health for suture removal (Tr. at 182-183). He reported continued use of marijuana and cigarettes, and he had no pain.

On November 11, 2004, plaintiff was seen at Swope Health complaining of right sided pain after having fallen against a door seven to eight days earlier (Tr. at 180-181). He was still smoking a half a pack of cigarettes per day and using marijuana. He reported pain as a five out of ten. The doctor told plaintiff to exercise, stop smoking, and stop using drugs and alcohol. He was prescribed Ultram (a narcotic-like pain reliever).

On January 11, 2005, plaintiff was seen at Swope Health complaining of recent frequent falls (Tr. at 178-179). He stated that he had had a grand mal seizure on December 28, 2004. Plaintiff continued to smoke a half a pack of cigarettes per day, and he reported no pain. The doctor assessed seizure disorder and prescribed Dilantin.

On February 8, 2005, plaintiff was seen at Swope Health (Tr. at 176-177). He reported that the Dilantin made him itch. He had no pain and continued to smoke a reported half pack of cigarettes per day. He was assessed with seizure disorder. The doctor discontinued plaintiff's Dilantin and started Depakote.

On March 11, 2005, plaintiff was seen at Swope Health complaining of shortness of breath and a productive cough (Tr. at 172-173, 192). He had lung x-rays which showed normal cardio-thoracic ratio and no pneumonia. Chronic bronchopulmonary changes were seen.

On May 30, 2005, plaintiff was seen at Swope Health for a follow up on bronchitis (Tr. at 170-171). Plaintiff reported no pain and said the Singulair had helped with his breathing. He was assessed with chronic obstructive pulmonary disease and tobacco use.

On July 15, 2005, plaintiff was seen at Swope Health for a follow up on a rash (Tr. at 166-167). His phenobarbitol (for seizures) was refilled.

On August 14, 2005, plaintiff was seen at Swope Health complaining that the Depakote was giving him the shakes (Tr. at 174-175). He described his pain as a 6. He was still smoking and using marijuana. His general exam was normal. He was prescribed Tegretol for seizure control.

On August 27, 2005, plaintiff was seen at Swope Health (Tr. at 165). He had been smoking 1/4 pack of cigarettes per day and sleeping under a bridge. He reported no pain, but he had a rash that was spreading. He was prescribed Tegretol for his seizures.

On September 12, 2005, plaintiff was seen at Swope Health (Tr. a 163-164). He complained of being hoarse. He lost his seizure medication about two months earlier when it was stolen. His prescriptions were refilled.

On November 25, 2005, plaintiff had x-rays of his chest (Tr. at 151). The findings were suggestive of chronic obstructive pulmonary disease.

On January 9, 2006, plaintiff was seen at Swope Health (Tr. at 159-160). He reported no pain. He was smoking 1/4 to 1/2 pack of cigarettes per day. He said the past three to four days he had been relying more on his Albuterol (treats chronic obstructive pulmonary disease). His general exam was normal as were his head, eyes, nose, ears, mouth, throat, neck, and heart. The doctor heard wheezes in plaintiff's lungs. He was assessed with acute bronchitis and chronic obstructive pulmonary disease and was prescribed Advair.

On January 18, 2006, plaintiff saw Mukesh Garg, M.D., for a cardiac consult after having been referred by Dr. Dembinski for evaluation of chest pain (Tr. at 149-150). "Mr. Statham has ben complaining of retrosternal chest pain for the last year and a half. He describes it as agonizing in nature, mostly on exertion and occasionally at rest. Pain is more severe with heavy exertion, and the patient describes complete relief of symptoms

with rest.  It happens in attacks each lasting 5 to 15 minutes and occurring at frequency of 3 times in a week."

Plaintiff's past medical history consisted of seizure disorder, hyperlipidemia, and chronic obstructive pulmonary disease.  Plaintiff reported having been a smoker for 35 years. He said he recently cut down from two packs per day to 10 cigarettes per day.  He was an "occasional alcohol drinker" and described "occasional use of pot."  Plaintiff was taking aspirin, Lipitor, Singulair, Albuterol, Phenobarbital, and Chlorephedra. Plaintiff was counseled on smoking cessation and was started on metropolol 12.5 mg twice a day (for high blood pressure).  "We will plan for left heart catheterization for definition of coronary anatomy and risk of stratification."

On January 23, 2006, plaintiff underwent a left heart catheterization, coronary angiography, and left ventriculography (Tr. at 147-148).  His left coronary artery was normal, his left anterior descending artery was normal, his left circumflex coronary artery was normal, his right coronary artery was dominant and free of disease, and he had no wall motion abnormalities.  Ejection fraction was 60%.[1]  He had no mitral

---

[1]During each heartbeat cycle, the heart contracts and relaxes.  When the heart contracts, it ejects blood from the two pumping chambers (ventricles).  When the heart relaxes, the ventricles refill with blood.  No matter how forceful the contraction, it does not empty all of the blood out of a ventricle.  The term "ejection fraction" refers to the percentage

regurgitation.[2]  The impression was "Normal coronary angiogram,

normal left ventriculogram."  The doctor recommended plaintiff be

worked up for other causes of chest pain given his normal

angiogram.

On February 6, 2006, plaintiff was seen at Swope Health (Tr.

at 156-157). He reported no pain, but said he had had grand mal

seizures for the past year and a half and petit mal seizures

since childhood.  Plaintiff reported having drunk three days

earlier and the next day he vomited red blood twice.  His general

exam was normal.  He was assessed with gastroesophageal reflux

disease.  He was told to stop smoking and to stop using drugs and

alcohol.

---

of blood that is pumped out of a filled ventricle with each
heartbeat.  Because the left ventricle is the heart's main
pumping chamber, ejection fraction is usually measured only in
the left ventricle (LV).  A normal LV ejection fraction is 55 to
70 percent.  The ejection fraction may decrease if the heart has
been damaged by a heart attack or other problems with the heart
valves or muscle.

[2]Mitral valve regurgitation — or mitral regurgitation —
happens when the heart's mitral valve does not close tightly,
which allows blood to flow backward in the heart.  The mitral
valve is located between the heart's two left chambers and allows
blood to flow forward through the heart during a normal
heartbeat.  Mitral valve regurgitation is also called mitral
insufficiency or mitral incompetence.  When the mitral valve does
not function properly, blood cannot move through the heart or to
the rest of the body as efficiently.  Mitral valve regurgitation
can make the person tired and short of breath.

On February 10, 2006, plaintiff was seen at Swope Health (Tr. at 154-155). He was listed as a smoker, and he reported using alcohol and some marijuana. His general exam was normal, and he reported no pain. His gastroesophageal reflux disease was listed as improved. He was told to continue his medications and to stop smoking.

On May 11, 2006, plaintiff was seen at Swope Health (Tr. at 228-230, 267-269). He complained of left shoulder pain and said he had had three seizures the previous week. "'Grand mal'? Sounds more like absent seizures". Plaintiff continued to smoke cigarettes and marijuana. His general exam was normal, including shoulder x-rays. He was assessed with chronic obstructive pulmonary disease, asthma, seizure disorder, and left shoulder pain. The doctor restarted Spiriva (for asthma) and prescribed Celebrex (non-steroidal anti-inflammatory). Plaintiff was told to stop smoking and return in three months.

On May 30, 2006, plaintiff was seen at Swope Health for an infected laceration (Tr. at 227, 266). He fell backwards the previous week into a metal cabinet and cut his left elbow. Plaintiff was given Ibuprofen and an antibiotic.

On July 7, 2006, plaintiff was seen at Swope Health for replacement medications (Tr. at 225-226, 264-265). Plaintiff's campsite was destroyed by fire caused by fireworks and all of his

medicine was burned.  He was having no pain, and his general exam
was normal.  He was assessed with chronic obstructive pulmonary
disease, chronic bronchitis, hyperlipidemia, and seizure
disorder; and his medications were refilled.  Plaintiff was told
to return in two months.

On October 13, 2006, plaintiff was seen at Swope Health for
medication refills and a rash (Tr. at 223-224, 262-263).  He
continued to smoke cigarettes and marijuana.  "Still has 1
seizure every 2-4 weeks" but his medication cut down on the
intensity.  He was assessed with hypertension, controlled;
asthma; and seizures.  He was continued on his same medications
an was told to exercise and come back in three months.

On October 27, 2006, plaintiff had lab work done (Tr. at
261).  His phenobarbital serum was low at 13 (normal is 15-40).

On November 14, 2006, plaintiff was seen at Swope Health for
a follow up on chronic obstructive pulmonary disease (Tr. at 221-
222, 259-260).  His history included, "epilepsy - grand mal since
1992, petite as a child."  His exam was normal.  He was assessed
with chronic obstructive pulmonary disease and hyperlipidemia.
He was told to stop smoking.

On November 22, 2006, plaintiff was seen at Swope Health for
a rash (Tr. at 219-220, 257-258).  He continued to smoke
cigarettes and use marijuana.  His general exam was normal.  He

was assessed with shingles and elbow pain. The doctor told him to stop smoking and prescribed Celebrex (non-steroidal anti-inflammatory).

On December 6, 2006, plaintiff was seen at Swope Health for a follow up on his rash (Tr. at 217-218, 255-256). He continued to use cigarettes and marijuana. He had no pain. He was assessed with herpes and told to come back as needed.

On December 13, 2006, plaintiff was seen at Swope Health (Tr. at 215-216, 253-254). He reported that he had had a seizure twice in the past two months. He continued to smoke and use marijuana. Plaintiff was continued on the same medications.

On December 15, 2006, plaintiff was seen at Swope Health (Tr. at 161-162). Plaintiff reported a couple of small seizures over the past three months during which he saw stars. Plaintiff reported no pain. His last grand mal seizure was one year earlier. His general exam was normal. He was continued on his medications and was told to stop smoking.

On March 22, 2007, plaintiff was seen at Swope Health to get refills (Tr. at 213-214, 250-251). Plaintiff reported that his last seizure had been about one and a half months earlier. He continued to smoke and use marijuana. No exam was performed. The doctor refilled plaintiff's medication and told him to come back in three months.

On June 19, 2007, plaintiff was seen at Swope Health complaining of sores on his arm and head (Tr. at 209-210, 246-247). He continued to smoke between 1/2 and 3/4 pack of cigarettes per day and to use marijuana. He had no pain, and his general exam was normal. He was assessed with folliculitis (inflammation of hair follicles).

On July 28, 2007, plaintiff was seen at Swope Health (Tr. at 211-212). He reported having had one seizure since his last visit. He continued to smoke and use marijuana. He had no pain. He was diagnosed with seizure disorder, hypertension (his blood pressure was 138/80), and chronic obstructive pulmonary disease. He was continued on his same medication.

On August 6, 2007, plaintiff was seen at Swope Health for what he believed was shingles (Tr. at 207-208, 244-245). He continued to smoke and use marijuana. He was assessed with a impetigo (a skin infection). Plaintiff was told to stop smoking.

On August 23, 2007, plaintiff was seen at Swope Health (Tr. at 248-249). He reported one seizure since his last visit. He had no pain, he continued to smoke, and he continued to use marijuana. Plaintiff was continued on his same medications.

On October 7, 2007, David Dembinski, M.D., from Swope Parkway Health Center wrote a letter to plaintiff's counsel (Tr. at 231, 270). The letter reads a follows:

Mr. Statham has been a patient at our clinic for about five years, mostly to see various mid-level providers for episodic care.  I personally have seen him on only a few occasions. . . .

The patient has a seizure disorder.  I <u>did</u> witness one spell on October 13, 2006, during which the patient became unresponsive to his surroundings for several minutes.  He has such spells perhaps monthly or so, and more often when he is out of his medicine.

He has asthma/COPD. On occasion wheezing has been heard on physical exam.  His chest X-Ray from 2005 showed evidence of chronic lung disease.  He has not had recent spirometry so it is difficult to quantify the severity of his breathing problem.

Regarding his employability:
> ***Because of his seizure disorder Mr. Statham cannot do work that involves driving, working at heights or around machinery, or that requires uninterrupted concentration.  His breathing problems preclude heavy manual labor.***

On November 26, 2007, plaintiff was seen at Swope Health complaining of scalp irritation (Tr. at 285-286).  He continued to smoke and use marijuana. He reported no pain.  His general exam was normal.

On December 28, 2007, plaintiff was seen at Swope Health (Tr. at 283-284).  Plaintiff reported that a week earlier, he got up to get some coffee and the next thing he knew he was on the floor.  He said he had been compliant with his medication. Plaintiff continued to smoke cigarettes and marijuana.  He was assessed with hypertension, seizure disorder, chronic obstructive

pulmonary disease, and high cholesterol.  He was continued on his same medications and told to come back in three months.

On January 31, 2008, plaintiff was seen at Swope Health complaining of pain in his left hand over the past three months (Tr. at 274, 281-282).  He continued to smoke and use marijuana. He had his left hand x-rayed (Tr. at 274).  There were minimal degenerative changes but no bone trauma or destruction. Plaintiff was assessed with high cholesterol, hypertension and chronic obstructive pulmonary disease.  His Lipitor was increased to 20 mg daily, and he was told to return in two months.

On February 2, 2008, plaintiff went to Centerpoint Medical Center by ambulance due to difficulty breathing and a cough (Tr. at 288-306).  He had and ECG[3] which revealed nonspecific T wave abnormality[4].  Plaintiff also had chest x-rays which showed no evidence of acute cardiopulmonary disease.  On that same day, plaintiff's lab work showed his phenobarbital normal at 20.2.  He was observed talking without difficulty, laughing, and joking (Tr. at 300).  While in the hospital, he took off his 5-lead monitor and his oxygen and refused to put either back on, even

---

[3]The electrocardiogram (ECG or EKG) is a diagnostic tool that measures and records the electrical activity of the heart in exquisite detail.

[4]The T wave represents repolarization, the recovery period of the ventricles.

though he claimed it was easier to breathe with his head between his legs (Tr. at 301). Plaintiff was told not to smoke (Tr. at 303, 305).

On March 14, 2008, plaintiff was seen at Swope Health for a medication refill (Tr. at 279-280). He continued to smoke cigarettes and marijuana. Plaintiff's general exam was normal.

On April 13, 2008, plaintiff was seen at Swope Health (Tr. at 277-278). Most of this record is illegible. Plaintiff was still smoking, and he reported no pain. His general exam was normal. He was assessed with high cholesterol, hyperlipidemia, chronic obstructive pulmonary disease, asthma, and one other thing that does not appear to be related to seizures. The doctor told plaintiff to stop smoking and return in three months.

On May 27, 2008, plaintiff was seen at Swope Health due to pain in his hip and right hand and an inability to make a full fist (Tr. at 275-276). He continued to smoke a half a pack of cigarettes per day. The doctor ordered x-rays and told plaintiff to come back in one to two months.

C.    *SUMMARY OF TESTIMONY*

During the August 18, 2008, hearing, plaintiff testified; and Barbara Myers, a vocational expert, testified at the request of the ALJ.

1.  **Plaintiff's testimony.**

     At the time of the hearing, plaintiff was 52 years of age
and is currently 54 (Tr. at 25-26).  Plaintiff was living alone
in an apartment in Independence, Missouri (Tr. at 26).  The
apartment building has an elevator and is designed for disabled
tenants (Tr. at 26).  Plaintiff is unmarried and has no children
(Tr. at 26).  Plaintiff has a GED and technical training in the
area of heating, ventilation, and air conditioning (Tr. at 26-
27).

     Plaintiff's alleged onset date is May 1, 2004; however, he
was unable to indicate the significance of that date (Tr. at 27).
He said it may have been the day that he had a grand mal seizure
while incarcerated, but he was not sure (Tr. at 27).  Plaintiff
was incarcerated for a couple weeks due to traffic tickets (Tr.
at 27).  Plaintiff earned $235 in 2004 (Tr. at 27).  Before that
he worked for a month an a half in 2002 repairing lawn and garden
equipment for Sears (Tr. at 27).  Plaintiff worked as a
maintenance man at a nursing home in 2001, the year of his
highest earnings, $19,323.32 (Tr. at 28).  Plaintiff worked at
the nursing home for a little over a year and left due to
disagreements on how thing were going (Tr. at 28).  Plaintiff had
some jobs through temporary services rehabbing apartments, making
bolts, and doing heating and cooling work (Tr. at 28).  Plaintiff

was released from his jobs when everything got caught up and he was no longer needed (Tr. at 28).

Plaintiff believes he is unable to work because he has unpredictable seizures; he was run over by a motor boat when he was 14; he was involved in a motorcycle accident which broke his ankle and lower right leg; he had lymphatic cancer "which is, is neither here nor there as far as my ability to work, but, you know, I just had a rough life to be honest." (Tr. at 29).  In a week's time, plaintiff may have no seizures, or he may have two (Tr. at 30).  His last seizure was two days before the administrative hearing (Tr. at 30).  He was sitting in his living room watching television and he woke up on the floor (Tr. at 30).  Plaintiff was unable to recall the last time he had been to the emergency room due to a seizure (Tr. at 31).  He described a petit mal seizure as feeling like he got slapped on the head with a board, he sees stars, and half his tongue goes numb (Tr. at 35).  He has grand mal seizures maybe once every three to four weeks, and he has petit mal seizures about every other week (Tr. at 35).  Plaintiff gets no warning signs before having a seizure (Tr. at 36).

Plaintiff cannot perform his past work because it would be dangerous to be on a ladder and have a seizure (Tr. at 33).  When asked if he could perform the work he did making bolts, plaintiff

said, "I probably could except business is down.  I don't even know if they're still in, in operation.  They were a small company." (Tr. at 33-34).  Upon further inquiry, plaintiff testified that the job required him to be on his feet all day, and he can no longer stand all day due to his right ankle (Tr. at 34).

Plaintiff went to the emergency room in early 2008 for breathing problems (Tr. at 36).  Since then he experiences shortness of breath after walking, and he coughs in the morning (Tr. at 37).  Depending on the day and the weather conditions, plaintiff can walk about a couple blocks (Tr. at 37).  After about 15 minutes of standing, his right ankle hurts (Tr. at 7). He has no trouble sitting (Tr. at 37).  Plaintiff believes he could comfortably lift ten to 15 pounds (Tr. at 37).   When asked what problems he would have lifting more than that, plaintiff said, "Well, I'm not no big buff guy, you know, and, you know, you, repetitive motion, I mean, this is, it's like, I mean, I could pick myself up, my own weight, but doing that all day long my body can't do it.  I'm not no weight lifter or body builder or anything to that extent." (Tr. at 37-38).

Plaintiff had a cardiac catheterization done after he began experiencing chest pain while walking (Tr. at 38-39).  He no longer experiences chest pain other than coughing (Tr. at 39).

Plaintiff suffers no side effects from any medication (Tr. at 31).

During a typical day, plaintiff will eat, sit around, watch television, go for a short walk, converse with other residents of the apartment complex, and go riding around with his brother (Tr. at 31). Plaintiff does not drive, he uses the public buses (Tr. at 31-32). Plaintiff shops for himself at a store one-half block from his apartment (Tr. at 32). Plaintiff cooks and can take care of his own personal needs (Tr. at 32). He smokes about a half a pack of cigarettes a day, down from two packs per day (Tr. at 32).

**2.  Vocational expert testimony.**

Vocational expert Barbara Myers testified at the request of the Administrative Law Judge. The first hypothetical involved a person who could sit for six hours; stand and walk for six hours; lift ten pounds frequently and 20 pounds occasionally; could never climb ladders, ropes, or scaffolds; should never be exposed to extremes of temperature, wetness, humidity, fumes, odors, dust, or hazards; and could not drive (Tr. at 40-41). The vocational expert testified that such a person could not perform plaintiff's past work, but could work as a collator operator, D.O.T. 208.685-010 with 1,000 jobs in Missouri and 35,000 in the country, or a folding machine operator, D.O.T. 208.685-014, with

500 in Missouri and 40,000 nationally; or a sub-assembler, D.O.T. 729.6784-054, with 2,000 in Missouri and 55,000 in the country (Tr. at 41). All three of those jobs are unskilled (SVP of 2) and light (Tr. at 41).

The second hypothetical included the limitations in the first but the person would be limited to simple, repetitive work (Tr. at 41). The vocational expert testified that the person could still perform the three jobs noted in the first hypothetical (Tr. at 41).

The third hypothetical involved the same non-exertional limitations but the person could sit for four hours per day, stand or walk for four hours per day, and would need a sit-stand option (Tr. at 41-42). The vocational expert testified that the three jobs would still be available but the numbers would be reduced by about 50 percent (Tr. at 42).

The fourth hypothetical involved a person who had approximately two seizures a week (Tr. at 42). The vocational expert testified that such a person could not work (Tr. at 42). Any grand mal seizure would make the person unemployable; about one petit mal seizure per week would be acceptable if it merely caused the person to be off task during the seizure (Tr. at 42).

The final hypothetical involved a person whose concentration was impaired 1/3 of the time (Tr. at 43). The vocational expert testified that such a person could not work (Tr. at 43).

## V.   FINDINGS OF THE ALJ

Administrative Law Judge Christine Cooke entered her opinion on September 24, 2008 (Tr. at 11-19). She found that plaintiff met the insured status requirements through March 31, 2007 (Tr. at 13).

Step one. Plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 13).

Step two. Plaintiff suffers from seizure disorder and chronic obstructive pulmonary disease, both severe impairments (Tr. at 13). Plaintiff's alleged heart problems are not a severe impairment (Tr. at 14).

Step three. Plaintiff's impairments do not meet or equal a listed impairment, specifically Listings 3.02, 11.02 and 11.03 (Tr. at 14-15).

Step four. Plaintiff retains the residual functional capacity to lift ten pounds frequently and 20 pounds occasionally; can sit, walk, or stand for four hours each; must have a sit/stand option; can never climb ladders, ropes or scaffolds; can never be in environments with extreme temperatures, wetness, humidity, fumes, odors, or dust; and

should not drive or be around unprotected heights or dangerous machinery (Tr. at 15). With this residual functional capacity, plaintiff cannot return to his past relevant work (Tr. at 17).

Step five. Plaintiff can work as a collator operator, a folding machine operator, or a subassembler, all of which are available in significant numbers in the regional and national economy (Tr. at 18).

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient

reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back,

standing for 15 to 20 minutes every hour, or sleeping on a
board).

The specific reasons listed by the ALJ for discrediting
plaintiff's subjective complaints of disability are as follows:

> The record indicates that the claimant has a poor work
> history with many years of low earnings.  Moreover, the
> claimant was not working before he applied for disability,
> which the claimant was not prevented from working due to his
> impairments.  Instead, the claimant's work history may
> indicate that he has low motivation to work.  In addition,
> the claimant testified at the hearing that he could probably
> return to his past job making bolts if they were still in
> business. . . .

> At the hearing, the claimant testified that he probably has
> a grand mal seizure every 2 or 3 weeks and has a petit mal
> seizure once every other week.  However the medical evidence
> does not support the alleged frequency of seizures.  The
> record does not show that the claimant has been to the
> emergency room for seizures.  Moreover, it is hard to
> ascertain from the record exactly what type of seizures he
> is having and if his episodes are actually "seizures."
> There are no CT scans of the claimant's head to support a
> finding of or correlate with a diagnosis of seizures.

> Further, the claimant's continued use of anti-seizure
> medication indicates that it is effective in controlling
> seizure outbreaks. The claimant reported that his seizure
> medication is somewhat effective.  While his anti-seizure
> medication levels have sometimes been low, the record
> indicates that the claimant is usually compliant with his
> medication.  In addition, the claimant reported that he has
> had grand mal seizures since 1992, so apparently, he has
> been able to work with them in the past without significant
> difficulties.  Based on these factors, the claimant's
> seizures are not totally debilitating, which is consistent
> with the restrictions outlined by the claimant's treating
> physician. . . .

> The claimant testified that he went to the emergency room
> once in 2008 for breathing problems, but otherwise has not
> had any other difficulties breathing.  He said he gets short

of breath if he walks a couple of blocks and coughs in the morning.  The evidence is mostly consistent with the claimant's allegations regarding his shortness of breath, as it shows he does not have significant problems. This is supported by the absence of spirometry and/or pulmonary function testing in the record.

Furthermore, the record indicates that the claimant continues to smokes [sic] cigarettes despite his doctor's advice to quit.  While he has cut back, the claimant's continued use of smoking cigarettes suggests that his asthma/COPD is not as severe as alleged and is inconsistent with the claimant's complaints of shortness of breath and the inability to work.  Overall, the record indicates that the claimant's asthma has been adequately controlled with medication.

At the hearing, the claimant said he could stand for 15 minutes before his right ankle begins to hurt.  However, the record does not show that the claimant has any musculoskeletal problems.  X-rays of the claimant's hip and left shoulder were negative.  Moreover, the claimant did not allege having musculoskeletal problems in his disability report. Furthermore, at the hearing, the claimant stated that he has not [sic] problems sitting and could lift 10 to 15 pounds without having any problems.  The claimant said he spent his day watching television, going for short walks, and conversing with other residents in his apartment complex.  He cooks, cleans, and grocery shops at a store a half a block away.  These activities indicate that his [sic] is more physically capable than alleged.

(Tr. at 15-16).

## 1.    *PRIOR WORK RECORD*

Plaintiff argues that the ALJ erred in finding that plaintiff has a history of low earnings without having inquired as to the reason for the low earnings.  This argument is without merit.

Plaintiff's work history shows 12 years with zero earnings. In addition, during three more years his annual income was less than $60. Nine other years saw annual earnings less than $5,000.

In 1989 plaintiff earned $1,701.78. Minimum wage in 1989 was $3.35 per hour. Assuming plaintiff was paid minimum wage, he would have worked a total of 507 hours, or about 12 1/2 weeks during the entire year. In 1993 he earned $3,343.06. Minimum wage was $4.25 in 1993. So plaintiff would have worked, at most, 786 hours or approximately 19 of the 52 weeks that year.

The ALJ was not required to inquire further into plaintiff's work history before concluding that his history of low earnings suggests a lack of motivation to work. The ALJ did point out that plaintiff was not working even before his alleged onset date, that he testified he could probably return to his past work if the company were still in business, and plaintiff left his previous jobs for reasons unrelated to his impairments.

## 2. *DAILY ACTIVITIES*

In a Function Report plaintiff stated that he could cook for "however long" it took and he could shop for "as long as needed."

## 3. *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS*

During an August 2004 doctor visit (which was just months after plaintiff's alleged onset date), plaintiff stated that other than a cough, he was doing fine.

On February 6, 2006, plaintiff told his doctor that he had had grand mal seizures for the past year and a half and petit mal seizures since childhood.  Although plaintiff had been on medication for seizure control, the medical records establish that plaintiff had complained of one seizure since his alleged onset date.  That seizure occurred on December 28, 2004 -- more than 14 months earlier.

In November 2006, plaintiff said he had had grand mal seizures since 1992.  If that is accurate, plaintiff was able to work for many years with what he described as grand mal seizures.

In December 2006, plaintiff described having a couple small seizures during which he saw stars.  His last "grand mal" seizure was a year earlier, according to him.  A year later in December 2007, plaintiff told his doctor he had gotten up to get coffee and the next thing he knew he was on the floor.  The doctor assessed seizure disorder but continued plaintiff on his same medication which indicates that the doctor believe the medication was adequately controlling the seizures (and possibly that the doctor may have questioned whether plaintiff's falling to the floor was the result of a seizure).

**4.    *PRECIPITATING AND AGGRAVATING FACTORS***

There is no evidence in the record about precipitating or aggravating factors.

## 5. *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION*

Plaintiff has essentially been on the same doses of the same medications for years, indicating that his treating physicians believe the medication is adequately controlling his symptoms. In addition, he was usually told to return in three months, which indicates the doctors expected plaintiff's symptoms would be adequately controlled during that time. Even in December 2006 when plaintiff claimed to have had two seizures in the past two months, his doctor continued him on the same medications. In July and August 2007, plaintiff reported having had one seizure during each of the last months, and his doctor continued him on the same medication both times. In December 2007 when plaintiff told his doctor that he had gotten up to get some coffee and the next thing he knew he was on the floor, the doctor did not adjust plaintiff's medication but told him to keep taking the same amount of the same thing and return in three months.

Plaintiff testified that he suffers no side effects from his medication.

## 6. *FUNCTIONAL RESTRICTIONS*

No doctor has ever restricted plaintiff's activities. Instead, plaintiff has been told on numerous occasions by his doctors to exercise.

Plaintiff testified that he has no trouble sitting and that he could comfortably lift ten to 15 pounds. In his Function Report, he stated that he only had difficulty with walking -- not with lifting, squatting, bending, standing, reaching, sitting, kneeling, talking, hearing, stair climbing, seeing, memory, completing tasks, concentration, understanding, following instructions, using his hands, or getting along with others.

**B.    *CREDIBILITY CONCLUSION***

The medical records establish that plaintiff's general exams were essentially normal during the entire span of time at issue here (Tr. at 133, 137-140, 147-148, 154-155, 156-157, 159-160, 174-175, 184-185, 209-210, 219-220, 221-222, 225-226, 228-230, 246-247, 257-258, 259-260, 264-265, 267-269, 277-278, 279-280, 285-286). Plaintiff was unable to explain the significance of his alleged onset date, as it did not correlate with the end of any job or the beginning or worsening of any medical condition. Plaintiff testified that he suffers from grand mal seizures once every three to four weeks and that he has petit mal seizures every other week; however, his medical records indicate that he may have had one grand mal seizure years ago, but that has not been established and given his doctor's reluctance to change his medication, it appears at least questionable that plaintiff actually experienced a grand mal seizure.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's description of his symptoms is not entirely credible.

## VII. *OPINION OF TREATING PHYSICIAN*

Plaintiff next argues that the ALJ erred in relying on a hypothetical that did not include plaintiff's inability to perform work requiring uninterrupted concentration. This argument is based on the letter from plaintiff's treating physician stating that plaintiff could not do work that involves driving, working at heights or around machinery, or that requires uninterrupted concentration. The doctor also said that plaintiff's breathing problems preclude heavy manual labor.

The ALJ had this to say about Dr. David Dembinski:

> In a letter dated October 17, 2007, David Dembinski, M.D., the claimant's treating physician at Swope Parkway Health Center, indicated that the claimant has a seizure disorder and asthma/COPD. Dr. Dembinski reported that he had witnessed a seizure spell in October 2006, in which the claimant became unresponsive to his surroundings for several minutes. The doctor indicated that the claimant had the spells about monthly and more often when he [is] out of medication. Dr. Dembinski reported that the claimant had wheezing on examination occasionally, but had not had recent spirometry, so quantifying the severity of his breathing problems would be difficult. The doctor opined that the claimant could not do work that involved driving, working at heights or around machinery, heavy manual labor, or uninterrupted concentrating. . . .
>
> The claimant's treating physician indicated that the claimant could work with restrictions of no driving, working at heights or around machinery, heavy manual labor, or uninterrupted concentrating. The undesigned gives the

37

> treating physician's opinions great weight as they are
> supported by the overall record and his treatment notes.
> Also, the State agency consultants indicated that the
> claimant could perform light work with seizure and
> environmental limitations.

(Tr. at 14, 16-17).

The ALJ apparently read Dr. Dembinski's opinion as one
indicating that plaintiff <u>could</u> perform some types of work, just
not the types listed in the letter.  Plaintiff argues that the
letter supports the hypothetical to the vocational expert which
involved a person whose concentration was impaired 1/3 of the
time -- the vocational expert testified that such a person could
not work.

A treating physician's opinion is granted controlling weight
when the opinion is not inconsistent with other substantial
evidence in the record and the opinion is well supported by
medically acceptable clinical and laboratory diagnostic
techniques.  <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005);
<u>Ellis v. Barnhart</u>, 392 F.3d 988, 998 (8th Cir. 2005).  If the ALJ
fails to give controlling weight to the opinion of the treating
physician, then the ALJ must consider several factors to
determine how much weight to give to the opinion of the treating
physician:  (1) the length of the treatment relationship, (2)
frequency of examinations, (3) nature and extent of the treatment
relationship, (4) supportability by medical signs and laboratory

findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. § 404.1527(d)(2) - (5).

In this case, it is fairly easy to discredit the opinion of Dr. Dembinski in this letter, should the opinion be interpreted as one precluding plaintiff from working due to lack of concentration at least 1/3 of the time. Dr. Dembinski admitted that he rarely saw plaintiff. The records from Swope Health where Dr. Dembinski would see plaintiff are replete with references to normal exams and continuing plaintiff on the same dosages of the same medications for years. Although Dr. Dembinski said in his letter that he witnessed plaintiff having a seizure on October 13, 2006, a review of the medical records from October 13, 2006, reveals that there was absolutely no mention of the doctor having witnessed any seizure (Tr. at 223-224, 262-263). Plaintiff's chief complaint on that day was "medication refills and rash". The doctor continued plaintiff on the same medications but added Singulair due to wheezing.

In addition to no corroboration in the medical records of an impaired ability to concentrate (really at all, much less for the 1/3 of the time which was included in the hypothetical), plaintiff indicated in his administrative paperwork that he had

no difficulty concentrating, finishing tasks, or following instructions.

Plaintiff's breathing difficulties cannot form the basis for an award of benefits since he continued to smoke both cigarettes and marijuana despite his doctors' repeated warnings to stop (Tr. at 149-150, 154-155, 156-157, 161-162, 207-208, 219-220, 221-222, 228-230, 244-245, 257-258, 259-260, 267-269, 2772-278, 303, 305). When an impairment can be controlled by treatment or medication, it cannot be considered disabling. Wheeler v. Apfel, 224 F.3d 891 (8th Cir. 2000); Kisling v. Chater, 105 F.3d 1255 (8th Cir. 1997). Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits. Id.; 20 C.F.R. § 416.930(b).

A hypothetical question posed to a vocational expert must include all credible impairments and limitations. Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006). A hypothetical relied on by the ALJ need not include impairments the ALJ has found not credible. Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Stormo v. Barnhart, 377 F.3d 801, 808-09 (8th Cir. 2004). Because the hypothetical relied on by the ALJ included all of plaintiff's credible impairments, plaintiff's motion for summary judgment on this basis will be denied.

## VII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
July 6, 2010